**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 13-CR-0205-CVE** |
| | ) |
| **IQBAL MAKKAR,** | ) |
| **a/k/a Jack Singh,** | ) |
| **a/k/a Iqbal Singh Makkar,** | ) |
| **GAURAV SEHGAL,** | ) |
| **a/k/a Ricky Sehgal,** | ) |
| | ) |
| **Defendants.** | ) |

<u>**OPINION AND ORDER**</u>

Now before the Court are Defendant Sehgal's Motion to Dismiss with Brief (Dkt. # 213) and

Defendant Makkar's Motion to Dismiss the Indictment with Prejudice in Accordance with the

Double Jeopardy Clause (Dkt. # 214). Defendants argue that the evidence presented at trial is

insufficient to show that defendants had the requisite mens rea established in the Tenth Circuit Court

of Appeals' decision (Dkt. # 194), and they ask the Court to dismiss the indictment with prejudice

on the ground that a retrial would violate the Double Jeopardy Clause of the Fifth Amendment.

**I.**

On November 5, 2013, a grand jury returned an indictment (Dkt. # 2) charging defendants

Iqbal Makkar and Gaurav Sehgal with conspiracy to distribute and possess with intent to distribute

a controlled substance analogue (count one),[1] possession of a controlled substance analogue with

intent to distribute (count two), maintaining a drug involved premises (count three), and conspiracy

---

[1]     The controlled substance analogue at issue in this case is known as XLR11, and it was not
listed as a controlled substance during the relevant time period. The Drug Enforcement
Agency (DEA) temporarily listed XLR11 as a controlled substance in May 2013.

to commit money laundering (count four).  Defendants filed a motion to dismiss the indictment on the grounds that the Controlled Substance Analogue Enforcement Act of 1986, 21 U.S.C. §§ 802(32) and 813 (CSAEA) was unconstitutionally vague and that application of the CSAEA would violate the Ex Post Facto Clause of the United States Constitution.  The Court denied the motion to dismiss, in part, because the CSAEA included a scienter requirement that the government must prove that defendants knew that they were distributing a controlled substance analogue in order to convict defendants.  Dkt. # 36, at 12-13.  The government filed a motion in limine seeking to prevent defendants from arguing that they were entrapped into committing a federal offense or that they were ignorant that their conduct violated federal law, because defendants claimed that they met with the Delaware County District Attorney and offered to submit their products for testing and they were allegedly told that they were allowed to sell "incense" without violating Oklahoma law.  Dkt. # 43. Defendants responded that this evidence went to the mens rea requirement under the CSAEA, because the evidence tended to show that the did not believe the "incense" they were selling was a controlled substance or controlled substance analogue.  Dkt. # 47.  The Court entered an opinion and order (Dkt. # 48) finding that defendants could not raise an entrapment defense or argue that they were ignorant of federal drug laws, but that the evidence could be relevant to the issue of intent and the evidence would be admitted subject to a limiting instruction at trial.  Dkt. # 48, at 5.

Trial began on April 21, 2014 and the Court held a conference before the prospective jurors were called into the courtroom to discuss procedural and evidentiary matters, including a limiting instruction concerning defendants' alleged meetings with state law enforcement officials.  Dkt. #

2

82, at 13-21.  The jury trial lasted five days and defendants were convicted on all counts.[2]
Defendants retained new counsel for sentencing matters.  Makkar was sentenced to 97 months
imprisonment and Sehgal was sentenced to 84 months imprisonment, and both defendants appealed
their convictions and sentences.

While the case was pending on appeal, the Supreme Court decided McFadden v. United
States, 135 S. Ct. 2298 (2015), in which the Supreme Court considered what knowledge a defendant
is required to possess for a conviction under the CSAEA.  The Supreme Court determined that the
knowledge requirement is met if "the defendant knew that the substance was controlled under the
[Controlled Substances Act (CSA)] or the [CSAEA], even if he did not know its identity" or if the
defendant "knew the specific features of the substance that make it a 'controlled substance
analogue.'" Id. at 2302.  In light of McFadden, a panel of the Tenth Circuit determined that this
Court gave an improper jury instruction as to defendants' mens rea under the CSAEA, and the Tenth
Circuit vacated defendants' convictions.  The Tenth Circuit did not determine whether the Double
Jeopardy Clause of the Fifth Amendment barred retrial of defendants, but remarked that it was
"unclear at this point whether the men can be lawfully retried consistent with the law's demands."
Dkt. # 194, at 17.

The Court held a status conference on January 22, 2016, and the government advised that
it would seek to retry defendants.  Defendants stated that they intended to file motions to dismiss
on the ground that retrial would violate the Double Jeopardy Clause.  The Court entered a
scheduling order (Dkt. # 212) setting briefing deadlines for defendants' motions to dismiss, and both

---

[2]      The Court will discuss the evidence presented at trial in greater detail below insofar as it
relates to the issues raised in defendants' motions to dismiss.  See infra at II.C.

defendants have filed motions to dismiss raising the issue of double jeopardy.  Dkt. ## 213, 214.

The government has filed a response (Dkt. # 215), defendants have filed replies (Dkt. ## 216, 217),

and the motions to dismiss are fully briefed.

## II.

## A.

The Double Jeopardy Clause of the Fifth Amendment provides that "No person shall . . . be

subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. CONST. amend.

V.  "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution

another opportunity to supply evidence which it failed to muster in the first proceeding." Burks v.

United States, 437 U.S. 1, 11 (1978).  However, the government is not always prohibited from

retrying a defendant following reversal of a conviction on appeal, and the government may retry a

defendant whose conviction was set aside due to trial error, rather than insufficiency of the evidence.

United States v. Pearl, 324 F.3d 1210, 1214 (10th Cir. 2003).  This case was remanded due to an

improper jury instruction and in such cases an appellate court may remand the case for retrial

without violating the Double Jeopardy Clause if the evidence presented at trial would be sufficient

to sustain a conviction under the proper jury instructions.  United States v. Smith, 82 F.3d 1564,

1567-68 (10th Cir. 1996).

When reviewing the sufficiency of the evidence to sustain a conviction, a reviewing court

asks "whether taking the evidence--both direct and circumstantial, together with the reasonable

inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury

could find the defendant guilty beyond a reasonable doubt." United States v. King, 632 F.3d 646,

650 (10th Cir. 2011) (quoting United States v. Jameson, 478 F.3d 1204, 1208 (10th Cir. 2007)).  The

Court will not "weigh conflicting evidence or consider witness credibility." United States v. Ramos-Arenas, 596 F.3d 783, 786 (10th Cir. 2010) (quoting United States v. Castorena-Jaime, 285 F.3d 916, 933 (10th Cir. 2002)).  "The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts." United States v. Anderson, 189 F.3d 1201, 1205 (10th Cir. 1999) (quoting United States v. Valacez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998)).  A reviewing court may not uphold a conviction "that was obtained by nothing more than 'piling inference upon inference' or where the evidence raises no more 'than a mere suspicion of guilt.'"  United States v. Rahseparian, 231 F.3d 1257, 1262 (10th Cir. 2000) (citations omitted).

## B.

Defendants argue that the Tenth Circuit made an implied finding that the evidence was insufficient to sustain a conviction under the CSAEA.  Dkt. # 213, at 2-4; Dkt. # 214, at 6-8.  Both defendants acknowledge that the Tenth Circuit remanded the case due to an error in the jury instructions in light of McFadden, but they argue that the Tenth Circuit's commentary on the evidence presented at trial impliedly expressed an opinion that defendants should be acquitted.  The government responds that the Tenth Circuit did not make any finding as to the sufficiency of the evidence to sustain a conviction and this issue was reserved for this Court on remand.  Dkt. # 215, at 6.

To resolve defendants' arguments, the Court must review the Tenth Circuit's decision to determine if the Tenth Circuit actually found that defendants could not be convicted based on the evidence presented at trial.  In a footnote, the Tenth Circuit stated:

5

> In this light, you might also wonder if double jeopardy precludes a retrial in this case. Given the parties' intent focus on the instructional error in this appeal, however, that's a matter we decline to pass upon one way or the other at this time and leave for the district court to address in the first instance on remand in the event the government should seek a retrial.

Dkt. # 194, at 11. This by itself provides strong evidence that the Tenth Circuit did not intend to rule on the issue of sufficiency of the evidence, because Makkar clearly raised the issue of sufficiency of the evidence on direct appeal and the Tenth Circuit expressly declined to consider this issue. See Dkt. # 214-1, at 3 (Makkar's opening brief filed with the Tenth Circuit). The Tenth Circuit remarked that it was "unclear at this point whether the men can be lawfully retried consistent with the law's demands." Dkt. # 194, at 17. This remark suggests that the Tenth Circuit was expressing doubt as to whether defendants could be retried, but it does not rise to the level of an express or implied finding that a retrial was impermissible.

Sehgal asks the Court to consider selected statements from the Tenth Circuit's decision in an attempt to show that the Tenth Circuit conclusively determined that defendants could not be retried. The Tenth Circuit stated that "as far as we can tell, at trial the government introduced no evidence suggesting that the defendants knew anything about the chemical structure of the incense they sold." Dkt. # 194, at 5. This statement falls far short of a conclusive finding that defendants could not be retried. The Tenth Circuit was clear that it was focusing on Makkar's argument concerning an instructional error, not the sufficiency of the evidence, and a statement that "as far as we can tell" does not suggest that the Tenth Circuit was making an explicit or implied finding that defendants could not be retried. The Tenth Circuit also remarked that the government "made no effort to carry the burden of producing evidence suggesting that the defendants knew the chemical composition of the incense they sold . . . ." Id. at 11. This statement does not actually make a

6

finding as to what evidence was or was not presented at trial, and it is most reasonably treated as a comment that the government did not intend to present evidence as to defendants' knowledge of the chemical structure of the products they sold.

The Court finds that the Tenth Circuit did not make an express or implied finding as to the sufficiency of the evidence concerning defendant's mens rea to commit a violation of the CSAEA, and this issue was reserved for this Court to consider in the first instance.  Of course, this Court will take into account the Tenth Circuit's views about the evidence presented at trial to inform the Court's finding as to the sufficiency of the evidence, but a plain reading of the Tenth Circuit's decision shows that a retrial was not expressly or impliedly foreclosed.  Instead, the Tenth Circuit "decline[d] to pass one way or the other" on this double jeopardy issue and it "[left] for the district court to address in the first instance on remand" the double jeopardy issue if the government elected to retry the case.  Id. at 11 n.1.  The government has elected to retry the case and it is appropriate for this Court to determine if the case can be retried without violating the Double Jeopardy Clause.

C.

Both defendants argue that the government did not present sufficient evidence at trial to sustain a conviction under the proper mens rea instruction under the CSAEA, and they ask the Court to dismiss the indictment with prejudice.  Defendants argue that there is no evidence that they knew the chemical structure of the substance they were selling and that this is an essential element to establish mens rea to sustain a conviction under the CSAEA, according to the Tenth Circuit.  The government responds that there was sufficient evidence presented at trial to establish that defendants knew that they were distributing a controlled substance analogue, and that this is sufficient to sustain a conviction under the mens rea requirement set forth by the Supreme Court in McFadden.

7

To determine if defendants can be retried, the Court will initially consider the requirements to establish that a defendant had the requisite mens rea to violate the CSAEA, as set forth in McFadden.  In McFadden, law enforcement officials were investigating a store in Charlottseville, Virginia that was selling "bath salts" that allegedly had similar effects to methamphetamine, cocaine, and other controlled substances.  McFadden, 135 S. Ct. at 2302.  Stephen McFadden supplied the store with the bath salts, and his packaging contained warnings that the bath salts were "not for human consumption" and that the bath salts did not contain any controlled substances.  Id.  The store owner agreed to cooperate with law enforcement officials and participate in controlled buys from McFadden, and testing of the packages purchased from McFadden revealed that the packages contained substances known as MDPV, Methylone, and 4-MEC.  Id. at 2303.  These substances had a similar effect on central nervous system as cocaine, methamphetamine, and methcathinone.  Id.  McFadden was indicted on eight counts of distributing a controlled substance analogue and one count of conspiracy and, at trial, he argued that he did not know the substances he was distributing were regulated under the CSAEA.  Id.  McFadden argued that he could be convicted only if he knew that the substances he was distributing had the characteristics of controlled substances analogues, "including the chemical structure and effects on the central nervous system."  Id.  The district court instructed the jury that McFadden could be convicted under the CSAEA if he "'knowingly and intentionally distributed a mixture or substance that has' substantially similar effects on the central nervous system as a controlled substance and '[t]hat that defendant intended for the mixture or substance to be consumed by humans.'"  Id.  McFadden was convicted on all nine counts and his convictions were affirmed on appeal, and the Supreme Court granted a petition for writ of certiorari to consider the mens rea required to convict a defendant under the CSAEA.

8

The Supreme Court initially examined the intent that a defendant must have to violate the CSA, and a defendant may be convicted if the government can prove that the defendant knew that he was dealing with any unspecified substance on the federal drug schedules. Id. at 2304. The knowledge requirement can be met by showing that the defendant "knew that he possessed a substance listed on the schedules, even if he did not know which substance it was," or that the defendant knew "the identity of the substance he possessed," even if he did not know it was a controlled substance. Id. The CSAEA expands the coverage of the CSA to include substances that are not listed on any federal schedule and defines a "controlled substance analogue" as a substance:

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). The Supreme Court stated that the CSAEA does not alter the intent requirement of the CSA and the government is still required to prove only that the defendant knew that he was dealing with a "controlled substance," and there are two ways for the government to establish the requisite knowledge in controlled substance analogue cases:

> First, it can be established by evidence that a defendant knew that the substance with which he was dealing is some controlled substance--that is, one actually listed on the federal drug schedules or treated as such by operation of the [CSAEA]--regardless of whether he knew the particular identity of the substance. Second, it can be established by evidence that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue. The [CSAEA] defines

> a controlled substance analogue by its features, as a substance "the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II"; "which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar or greater than" the effect of a controlled substance in schedule I or II; or which is represented or intended to have that effect with respect to a particular person. § 802(32)(A). A defendant who possesses a substance with knowledge of those features knows all of the facts that makes his conduct illegal, just as a defendant who possesses heroin knows all of the facts that make his conduct illegal.

McFadden, 135 S. Ct. at 2305. The Supreme Court specifically rejected McFadden's argument that the government be required to show that the defendant had "knowledge of the characteristics that make a substance an 'analogue,'" including the chemical structure of the substance. Id. at 2303, 2306. The jury instructions given by the district court did not "fully convey" the mental state required to establish a violation of the CSAEA and the case was remanded to the Fourth Circuit Court of Appeals to determine if the instructional error was harmless.

This case was pending before the Tenth Circuit when McFadden was decided, and Makkar challenged the jury instructions on direct appeal. See Dkt. # 214-1, at 2. The Tenth Circuit reversed defendants' conviction and remanded the case for further proceedings due to an instructional error. The Tenth Circuit characterized the Supreme Court's construction of the mens rea requirement as "narrow," and the Tenth Circuit described the government's burden as follows:

> the Court accepted the government's concession that to establish a violation of the Analogue Act it must prove the drug in question bears two features: (1) it must be substantially similar in chemical structure to a schedule I or II CSA controlled substance, and (2) it must have, or be represented or intended to have, an effect on the central nervous system that is substantially similar to that of a schedule I or II CSA substance. When it comes to mens rea, the Court further explained, the government must show that the defendant knew the drug he possessed either (1) had both of these features, or (2) was controlled by the CSA or Analogue Act.

Dkt. # 194, at 3-4. The government acknowledged that it did not attempt to show that defendants had the required mens rea under the second method -- that defendants knew that XLR11 was

10

controlled under the CSAEA -- and the Tenth Circuit considered whether the mens rea instruction was adequate under the first method.  Id. at 5.  The Tenth Circuit found that the jury instruction in this case was inadequate, because the jury was not instructed that defendants could be convicted only the government proved beyond a reasonable doubt that defendants knew that XLR11 had "(1) a substantially similar chemical structure to JWH-18 (synthetic cannabinoid with marijuana-like effects listed as a CSA controlled substance) and (2) a substantially similar effect to that of marijuana (another CSA listed substance)."  Id.  Instead, the jury was permitted to infer that XLR11 had a similar chemical structure if XLR11 was proven to have a substantially similar effect as a listed controlled substance.  The Tenth Circuit explained that a conviction under the CSAEA requires that defendants have knowledge that XLR11 has a substantially similar chemical structure to a listed controlled substance.[3]  Id. at 6.  Defendants did not object to the jury instruction given at trial, but the Tenth Circuit found that it could reach the jury instruction issue under the plain error doctrine.  Id. at 8-11.  In addition to the instructional error, the Tenth Circuit considered Sehgal's argument that the Court improperly excluded evidence that he "turned to law enforcement for information about the drug's composition and offered to suspend sales until tests could be performed."  Id. at 15.

The government's response focuses on the mens rea requirement as articulated in McFadden, and there is little discussion of the Tenth Circuit's decision reversing and remanding the case for

---

[3]     Although not directly stated by the Tenth Circuit, a defendant can be convicted under this method of proving mens rea only if there is evidence that the defendant knew the chemical structure of the alleged controlled substance analogue and the listed controlled substance. It would also appear that the defendant would be required to be able to knowingly compare the two substances and be able to appreciate that the substances have a substantially similar chemical structure.

further proceedings in light of McFadden.  However, the Tenth Circuit's decision expressly directs that "any further proceedings shall conform with this opinion," and the Court must carefully consider the mens rea requirement under the CSAEA as articulated by the Tenth Circuit. Id. at 17. The government argues that evidence of a substance's chemical structure would go to the second method of proving mens rea (that the defendants knew the identity of the substance they were distributing), but it argues that  defendants can be retried if there is sufficient evidence that defendants knew "that the substance with which [they were] dealing is some controlled substance -- that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act -- regardless of whether [they] knew the particular identity of the substance." Id. at 9 (quoting McFadden, 135 S. Ct. at 2305).  It is apparent from the Tenth Circuit's decision that a defendant's knowledge of a substance's chemical structure, in addition to the knowledge of the chemical structure of a listed substance, is a required element to prove mens rea in this manner. See Dkt. # 194, at 5 (explaining that the government was required to show that XLR11 had a substantially similar chemical structure and effect to a controlled substance and noting that the government "sought to shrug off the first of the mens rea requirements . . ."); id. at 11 (the government "made no effort to carry the burden of producing evidence suggesting that the defendants knew the chemical composition of the incense they sold, relying instead entirely and admittedly on an unsound inference"); id. at 12 (describing the government's burden under McFadden as "challenging" and clearly stating that the government must prove that defendants "(1) knew the drug in question had both a similar chemical structure and similar effects to a controlled substance, or (2) knew the drug in question was unlawful under the Analogue Act or CSA").  The Tenth Circuit's decision leaves no doubt that the government must prove that defendants knew that

XLR11 was substantially similar in chemical structure <u>and</u> effect in order to satisfy the first method of establishing mens rea under <u>McFadden</u>.

The Court will begin the analysis of whether a retrial is permitted by considering what is not substantially disputed, which is that defendants were aware that the substance they were distributing had a substantially similar or greater effect than a controlled substance. Robert Kintner, an employee at the Gitter Done store in Grove, Oklahoma, testified that he was employed by defendants and that defendants sold synthetic marijuana[4] at Gitter Done. Dkt. # 83, at 202-03, 207. Store employees were not supposed to talk about selling "incense," also called K2, but they were directed to sell it by Makkar and Sehgal. <u>Id.</u> at 208. Sehgal gave some of the product to Kintner and directed him to try it, and Kintner understood that he was supposed to smoke different brands of synthetic marijuana and tell Sehgal which brand he liked better. <u>Id.</u> at 213. Kintner described the effect of the products as a "really intense marijuana high . . . ." <u>Id.</u> at 215. Kintner experienced seizures and hallucinations and Kintner reported this information to Sehgal, and Sehgal "just started laughing about it." <u>Id.</u> at 215-16. Kintner identified Diablo as the brand that gave him the longest high. <u>Id.</u> at 218. Kyle Ward, another Gitter Done employee, testified that he sold "incense" at the direction of Makkar and Sehgal, and Ward often sold "incense" more than 100 times per day. Dkt. # 84, at

---

[4]     Different witnesses used the terms "synthetic marijuana" and "synthetic cannabinoids" when referring to the substance at issue in this case. Expert witnesses and certain law enforcement witnesses referred to the substance as a "synthetic cannabinoid," while the store employees and users of the substance referred to it as "synthetic marijuana." This Opinion and Order does not concern whether the substance sold by defendants was actually XLR11 and the identification of XLR11 as a controlled substance analogue, but the Court is focused on defendants' knowledge and whether they knew they were violating the CSAEA. The witnesses whose testimony will be examined in this Opinion and Order primarily used the term "synthetic marijuana," and the Court will do so as well to maintain consistency with the testimony.

51-52.  Sehgal told Ward to try the "incense" and see what it was like, and he described the high from smoking synthetic marijuana as about "a thousand times stronger" than actual marijuana.  Id. at 55-56.  Heather Majors, a Gitter Done employee, used the synthetic marijuana sold at the store, and she felt like she was in a "catatonic state and [she] felt like [she] was going to die."  Id. at 111.  She told Sehgal about her experience using synthetic marijuana, and Sehgal "just joked and brushed it off."  Id.  Majors talked to Makkar and Makkar said that he had smoked synthetic marijuana, and Makkar said he thought it was going to kill him.  Id. at 112.

In addition to the testimony of employees, the government presented the testimony of witnesses who had used the synthetic marijuana sold at defendants' stores and had firsthand knowledge of the effects of the substance.  Michael Vincent Mitchell purchased synthetic marijuana at Gitter Done, and he smoked synthetic marijuana because he was on probation and he was told that synthetic marijuana would not show up on drug tests.  Id. at 145-46.  Mitchell testified that the high from using synthetic marijuana was similar to the effect of marijuana but much more intense, and he preferred to use a brand called "Diablo" because it was the strongest synthetic marijuana sold at Gitter Done.  Id. at 147.  Mitchell smoked synthetic marijuana with Jesse and Alex Silva, and he noticed that they passed out and would drool on themselves when they used synthetic marijuana.  Id. at 148.  Mitchell spent about $2,000 per week on synthetic marijuana and he eventually stopped

using the substance after one of his friends was seriously hurt after using the substance.[5]  Id. at 149.

Colton Johnson testified that he smoked synthetic marijuana, because he smoked marijuana while

he was in high school and his friends advised him that synthetic marijuana would not show up on

drug tests when he applied for jobs.  Id. at 165.  Johnson purchased synthetic marijuana at Gitter

Done.  Id. at 166.  The effect of synthetic marijuana was similar to the effect of marijuana, but it was

more intense and it made him hallucinate and feel like he was having an anxiety attack.  Id.  In

January 2013, Johnson smoked synthetic marijuana purchased from Gitter Done, and he woke up

in the emergency room and that was the last time he used synthetic marijuana.  Id. at 167.  Alex

Silva testified that he used synthetic marijuana that he purchased from Gitter Done, and he stopped

using marijuana because it did not provide the same high as synthetic marijuana.  Id. at 182.  Silva

explained that his heartrate would increase dramatically and he felt like he was having a panic attack

when he would use synthetic marijuana.[6]  Id. at 182-83.  Jesus Silva testified that he purchased

synthetic marijuana from Gitter Done, and synthetic marijuana put him in a trance.  Id. at 204.  On

one occasion, he woke up in the hospital after using synthetic marijuana and he had been in a coma

---

[5]     The Tenth Circuit was critical of the government and the Court because the "government endorsed and the district court admitted unreliable and inflammatory testimony . . . that incense killed his friend--even though the friend was alive and apparently well--and scheduled to testify later the same day."  Dkt. # 194, at 16.  Mitchell did volunteer that he stopped using synthetic marijuana after it killed his friend, but this response was not invited or encouraged by the government's examination of Mitchell.  The Court immediately held a bench conference after Mitchell's statement, and the jury was instructed to ignore Mitchell's statement that his friend had died.  Dkt. # 84, at 152-53 ("Number one, you are to ignore the last answer of the witness.  The alleged dead man will be here to testify and you should ignore the statement that it killed his friend, and you must follow that.").

[6]     The Court excluded statements made by Alex Silva that other people he knew would have "heart attacks . . . because it makes your heart speed up when you smoke it," because he could testify only about his personal experience using synthetic marijuana.  Id. at 183.

for three weeks, and he has suffered from short-term memory loss and seizures following his hospitalization. Id. at 207. At least two store employees testified that they received complaints that a customer was harmed after ingesting synthetic marijuana and they informed Sehgal of the complaints, but the store continued to sell synthetic marijuana and Sehgal did not appear to give much weight to the complaints. Id. at 81-82, 103.

The Court finds that this evidence is sufficient to establish that defendants knew that the substance they were selling had a similar or greater effect than a controlled substance in Schedule I or II of the CSA. There is evidence that defendants actively encouraged their employees to smoke synthetic marijuana and report back about the effect of the product. Dkt. # 83, at 213-215; Dkt. # 84, at 55-56; id. at 111. Kintner told Sehgal that he experienced seizures and had hallucinations after smoking synthetic marijuana, and Sehgal "just started laughing about it." Dkt. # 83, at 215. Makkar admitted to Majors that he had personally smoked synthetic marijuana and he thought that it was going to kill him. Id. at 112. Defendants received complaints that people had been harmed by smoking synthetic marijuana, and Sehgal said that he would take care of it or that it was not his problem. Id. at 103. Users of synthetic marijuana testified about the effects of smoking products purchased at defendants' stores, but it is unclear if defendants were aware of the harm suffered by these witnesses. In any event, the test as stated by the Tenth Circuit was whether defendants knew that the substance they sold had "a substantially similar chemical structure to JWH-018 (a synthetic cannabinoid with marijuana-like effects listed as a CSA controlled substance)." Dkt. # 194, at 5. Viewing the evidence in a light most favorable to the government, there was sufficient evidence presented at trial from which a reasonable jury could have found beyond a reasonable doubt that

defendants knew that the substance they distributed had an effect similar or greater to marijuana or another listed synthetic cannabinoid.

However, this is not sufficient to establish that defendants had the requisite mens rea to violate the CSAEA, and the Tenth Circuit made clear that defendants could be convicted only if defendants knew that the substance they were selling had "a substantially similar chemical structure to JWH-18." Dkt. # 194, at 5. The government argues that there is ample evidence to support a finding that defendants knew that they were selling a "controlled substance," even if they did not know the specific identity or chemical structure of the substance, and the government asks the Court to consider circumstantial evidence going to defendants' intent. Dkt. # 215, at 8-10. Law enforcement officials executed a search warrant at Gitter Done on January 31, 2013, and they recovered synthetic cannabinoids and drug paraphernalia, and many of the synthetic marijuana products were openly displayed in the store. Dkt. # 82, at 73-73. Eason was particularly interested in certain brands of synthetic marijuana being sold, because he had received complaints that persons had sought treatment in an emergency room after taking "Diablo." Id. at 73. He also noticed one brand labeled "7H Kush" and this was significant, because "kush" is a slang term for marijuana. On the upper-left hand corner of the display, there was a sign that read "not for human consumption." Id. at 75. Eason testified that this was a marketing ploy common in the sale of synthetic marijuana and it made it appear that defendants were selling a legitimate product.[7] Id. at 76. Law enforcement

---

[7]     In addition to being a marketing ploy, the Court notes that placing a sign reading "not for human consumption" shows that defendants had actual knowledge of the CSAEA because, under 21 U.S.C. § 813, a substance is treated as a controlled substance analogue for the purpose of federal drug laws only if it is "intended for human consumption." A reasonable jury could infer that defendants knew and were actively trying to circumvent the CSAEA by placing signs stating that a product designated as "incense," which was actually a synthetic cannabinoid, was not for human consumption.

officials found rolling papers and cigar wraps in close proximity to the display case containing the synthetic marijuana, and Eason found that this supported a conclusion that the packages inside the display case contained a substance that was intended to be smoked.  Id. at 76-77.  Eason found several thousand packages of synthetic marijuana in file cabinets and containers in the store.  Id. at 79-81.  In the office of the store, law enforcement officials found a safe containing more synthetic marijuana and glass pipes that could be used to smoke the synthetic marijuana, and Eason found that close proximity of the synthetic marijuana and the glass pipes showed that defendants knew people were consuming the product.  Id. at 82-83, 88.  Counsel for Makkar asked Eason if he had prepared a report in November 2011 stating that defendants had agreed to "stop selling potpourri or incense until tests could be done to make sure they [sic] were no illegal newly scheduled chemicals associated with it?"  Id. at 96.  The report referenced a change in Oklahoma law to include 137 chemicals on the state list of controlled substances.  Id. at 98.  The government requested a bench conference and requested a limiting instruction that state law would not be relevant to issue of whether defendants' conduct violated federal law.  Id. at 96.  The Court did not exclude the report or prevent defense counsel from asking questions about the report, but the Court did provide the following limiting instruction:

> This is a federal prosecution of defendants for violation of federal law, including federal drug laws.  Oklahoma law and conversations with state law enforcement officials are not probative of any of the elements the government must prove.  To the extent any such evidence would be admitted in this case, your consideration of that evidence will be limited to determining notice to and knowledge of and/or intent of defendants.  This is a limiting instruction you must follow.

Id. at 98. Following the limiting instruction, defense counsel stated that he had no further questions and he did not attempt to offer Eason's report into evidence.[8] Id. Eason testified that incense sticks were sold at Gitter Done, but they were in a locked display case and they were not placed near smoking products. Id. at 117-18. Eason was not aware of any legitimate uses for the synthetic marijuana and it would not be something that people would choose to burn as incense. Id. at 117. The products in the locked display case that were labeled as "incense" sold for between $21.99 and $39.99 per package. Id. at 75.

Multiple undercover agents made controlled buys of synthetic marijuana from Gitter Done, and during many of the controlled buys the agents attempted to purchase a smoking device or actually purchased rolling papers with the synthetic marijuana. Id. at 124, 126, 148. DEA Special Agent Delbert Sparger was present during the execution of the search warrant at Gitter Done, and 4,266 packages of synthetic marijuana were recovered. Dkt. # 83, at 20. The packages had a street value of approximately $100,000. Id. at 21. The packages were labeled "not for human consumption," and Sparger testified that based on his experience this is a common marketing ploy to make it appear that the "incense" or "potpourri" is a legitimate product. Id. at 22-23. Sehgal's house was searched pursuant to a search warrant and an invoice from a company called Smoke

_____

[8]     The Tenth Circuit's decision suggests that the Court excluded evidence "showing that [defendants] asked state law enforcement agents to test the incense to assure its legality under state law--and that they offered to stop selling the incense until the results came in." Dkt. # 194, at 13. The Court did not exclude the evidence and gave a limiting instruction specifically stating that jury could consider the evidence as to defendants' knowledge or intent to violate the law. Defendants' trial brief states that they allegedly approached a state district attorney and provided samples of the product for testing, but the Oklahoma State Bureau of Investigations (OSBI) declined to test the substance and the samples were not submitted to an independent laboratory. Dkt. # 40, at 3-4. Defendants could have offered this evidence at trial pursuant to a limiting instruction, but defense counsel declined to proceed with this line of questions after the limiting instruction was given. Dkt. # 82, at 98.

Tokes was found.  Id. at 25.  The products listed on the invoice were synthetic marijuana, and Sparger noted that the term "toke" is a slang term for marijuana.  Id.  Sparger also found a document apparently intended for employees of Gitter Done to sign, and it stated as follows:

> I . . . fully understand incense is not intended to be used in any form of human consumption, and will not advise anyone otherwise.  Incense will not be sold to anyone under the age of 18.  If any employee advises otherwise, it will result in job termination.

Id. at 26.  The document was on Sehgal's computer, and to Sparger it showed that Sehgal was trying to insulate himself from the sale of synthetic marijuana.  Id. at 27.  A similar document was also found on a thumb drive seized from Makkar's residence.  Id.  During his investigation, Sparger learned that defendants attended a "convention" in Las Vegas, Nevada where they received information about products and the vendors supplied lab reports in an attempt to show that the products were legal, but Sparger had no doubt that the lab reports were falsified in an attempt to thwart law enforcement.  Id. at 33-35.  On re-direct examination, Sparger discussed the lab reports found at defendants' residences in greater detail.  Sparger found two separate types of lab reports, and the first type of report was a "does-not-contain" report that simply identified what the substance did not contain.  Id. at 60.  These types of reports are often used to create an appearance of legality and do not actually identify the tested substance.[9]  Id. at 60-61.  At least one of the companies from which defendants purchased synthetic cannabinoids has been shut down as the result of a DEA investigation.  Id. at 65-66.

---

[9]     Counsel for the government ended this line of questioning without asking what was in the lab reports allegedly possessed by defendants that would have shown the actual composition of the substance.  The Court does not conclude from Sparger's testimony that defendants actually had lab reports showing the chemical structure or composition of any substance or that defendants possessed falsified reports, because Sparger stops short of making such an assertion.

The testimony of Gitter Done employees suggests that defendants knew that they were distributing some type of controlled substance, and particularly that defendants knew that they were distributing a controlled substance analogue.  Kintnter testified that he sold synthetic marijuana, known as incense or K2, while he was employed at Gitter Done, and store employees were not supposed to talk about the product with customers.  Dkt. # 83, at 208.  Makkar once stated that he "[felt] like a drug dealer around here, your local drug dealer," because Gitter Done sold so much synthetic marijuana.  Id. at 218.  At one point, Gitter Done stopped selling synthetic marijuana and the product was removed from the store, but different brands of synthetic marijuana were substituted and Gitter Done began selling synthetic marijuana again.  Id. at 230.  Even though defendants labeled the synthetic marijuana as "incense," customers asked for K2 and it was apparent to Kintner that the customers intended to smoke the product.  Id. at 236-37.  Ward testified that he sold over 100 packages of "incense" per day and many customers purchased rolling papers at the same time, but he was prohibited from talking to customers about the product or suggesting that it was for human consumption.  Dkt. # 84, at 51-53.  There were no rules prohibiting store employees from discussing any other product with customers, and the only thing he was permitted to say about "incense" was that it was not for human consumption.  Id. at 54.  Sehgal made Ward sign a document stating that  incense was not intended for human consumption, but Ward understood that customers were actually smoking the product.  Id. at 56-57.  Ward was directed by defendants to refuse to sell incense to a customer if the customer openly remarked that he intended to smoke the product.  Id. at 75.  Ward relayed a complaint to Sehgal after a customer smoked the incense, and defendants knew that Ward had personally smoked the product and he was not fired for doing so. Id. at 81-82.  Kendra Hensley  testified that she believed customers were smoking the incense and

the store received complaints about the incense, and she informed Sehgal of the complaints.  Id. at

103.  Sehgal said that he would handle it or that the complaints were not his problem.  Id.  Heather

Majors testified that she was not permitted to discuss the uses of incense with customers, but Sehgal

and Makkar both knew that Majors had smoked the product.  Id. at 111-12.  Calvin McNett, a

salesman for Impulse Plus, sold synthetic marijuana to Makkar for Gitter Done and other stores, and

McNett later became employed by Makkar to sell synthetic marijuana on behalf of Makkar. Dkt. #

85, at 29, 33.  McNett initially thought that people burned the incense for aromatic purposes but he

learned that people smoked the substance.  Id. at 32.  McNett believed at the time that he was selling

a legal substance, but he came to believe selling synthetic marijuana was illegal.  Id. at 51.

The evidence presented at trial would have permitted the trier of fact to find that defendants

were aware of the CSAEA and that the substance they were distributing was a controlled substance

analogue under the CSAEA, even if defendants did not know the identity of the substance.  The

display case holding the synthetic marijuana at Gitter Done had a sign that read "not for human

consumption.  Dkt. # 82, at 75.  Defendants directed their employees to refrain from discussing that

the "incense" sold at their stores could be smoked or ingested, but each employee testified that the

"incense" was frequently sold with wrapping papers for smoking.  Employees at Gitter Done were

required to sign a contract stating that they knew that "incense" was not for human consumption,

but each employee also testified that defendants encouraged them to smoke synthetic marijuana and

report back about it effects.   Defendants sold incense sticks at Gitter Done, but they were not in a

locked case and were not sold near smoking paraphernalia.  Id. at 117-18.  The government notes

that the packets of "incense" that were smoked by customers of defendants' stores  cost between

$21.99 and $39.99 and each package was marked "not for human consumption."  Id. at 75-77.

Sparger found questionable lab reports during a search of defendants' residences that failed to fully describe what was in the products sold by defendants, and Sparger believed that the reports were intended to create a false appearance of legality.  Dkt. # 83, at 60.  Viewed in a light most favorable to the government, this evidence would support a finding beyond a reasonable doubt that defendants were actually aware of the CSAEA and that they were  attempting to avoid criminal liability by outwardly representing that "incense" was not for human consumption.  The evidence also supports a finding that defendants knew that they were selling a substance that was a controlled substance analogue, even if they did not know the chemical composition of the substance or the identity of the substance.

However, the Tenth Circuit directed this Court to consider whether there was evidence that defendants knew the chemical composition of the substance they sold and whether that chemical structure was substantially similar to the chemical structure of a listed controlled substance.  The Tenth Circuit stated more than once that the government failed to produce such evidence at trial.  Dkt. # 194, at 5 ("In fact, as far as we can tell, at trial the government introduced no evidence suggesting that the defendants knew anything about the chemical structure of the incense they sold"); id. at 11 ("And surely a defendant's substantial rights and the integrity of judicial proceedings are both implicated when he is relegated to federal prison even though the government concedes it hasn't proven what the law demands it must prove to send him there.").  The Court has fully reviewed the trial transcript and there is no direct evidence that defendants knew the chemical structure of the substance they were selling or that the chemical structure of that substance was

substantially similar to a listed controlled substance.[10]  The Court would be inclined to find that circumstantial evidence was presented, but the Tenth Circuit expressly stated in its opinion that there was "no evidence," either direct or circumstantial, that could satisfy the government's burden as to mens rea  if the case were retried.[11]  A district court may not reopen an issue that was conclusively decided as part of a direct appeal and, even though the Tenth Circuit declined to make a finding on the issue of double jeopardy, the Tenth Circuit made at least an implicit finding that there was no

---

[10]     It is unsurprising that the record fails to contain any evidence that defendants actually knew the chemical structure of XLR11 and JWH-018, because from the outset of the trial the government had no notice that this type of proof would be required.  On the first day of trial, the Court held a hearing with the parties and counsel before jury selection began, and the Court twice stated that the government would not be required to prove that defendants knew the exact chemical composition of the substance.  Dkt. # 82, at 15, 24.  Counsel for defendants made no objection on this point.

[11]     In McFadden, the Supreme Court rejected McFadden's argument that a defendant could be convicted under the CSAEA only if he had "knowledge of the characteristics that make a substance an 'analogue' under the [CSAEA]."  McFadden, 135 S. Ct. 2306.  Instead, the government could show that the defendant had "knowledge that a substance is listed or treated as listed by operation of the [CSAEA]."  Id.  In a footnote, the Supreme Court clarified that the government "need not introduce direct evidence of such knowledge . . . [and] the Government may offer circumstantial evidence of that knowledge."  Id. at 2306 n.3.  The Tenth Circuit's decision in this case does not discuss by what means the government may prove a defendant's knowledge of the chemical structure of a substance, and there is no mention of any of the circumstantial evidence tending to support a conclusion that defendants knew that they were distributing a controlled substance analogue.  It is also unclear if evidence such as falsified or incomplete lab reports would tend to establish a defendant's knowledge of the chemical structure of a substance under a theory of willful ignorance.  Based on the Court's experience in CSAEA cases, it is unlikely that the government will ever be able to prove that a person distributing, or even manufacturing, a controlled substance analogue actually knows the chemical structure of the substance and has compared that chemical structure to a listed controlled substance.  In light of the Tenth Circuit panel's finding that the evidence in this case was insufficient as to defendants' knowledge of the chemical structure of the substance they sold, the manner in which the government can successfully prove that a defendant knows that he was dealing with a controlled substance analogue may be a matter for consideration of the Tenth Circuit en banc.

evidence that defendants knew the chemical structure of the products they sold under the label of "incense." This Court is bound by the Tenth Circuit's finding that there was no evidence presented that would establish that defendants knew the chemical structure of the substance they sold, XLR11, and that XLR11 had a substantially similar chemical structure to JWH-018. Based on this finding, the Court finds that the evidence presented at trial would not be sufficient to sustain defendants' convictions under the proper jury instructions, and defendants cannot be retried without violating the Double Jeopardy Clause. The Court will enter of a judgment of acquittal.[12]

**IT IS THEREFORE ORDERED** that Defendant Sehgal's Motion to Dismiss with Brief (Dkt. # 213) and Defendant Makkar's Motion to Dismiss the Indictment with Prejudice in Accordance with the Double Jeopardy Clause (Dkt. # 214) are **granted**. A judgment of acquittal shall be entered.

**DATED** this 11th day of May, 2016.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[12]     Defendants ask the Court to dismiss the indictment with prejudice, but in <u>Burks</u> the Supreme Court stated "the only 'just' remedy available" for a court that has found the evidence legally insufficient to retry a defendant is to enter a judgment of acquittal. <u>Burks</u>, 437 U.S. at 18. Therefore, the Court will enter a judgment of acquittal instead of dismissing the indictment with prejudice.